107 F.3d 32
 323 U.S.App.D.C. 219
 WASHINGTON LEGAL CLINIC FOR THE HOMELESS, et al., Appellees
v.
Marion S. BARRY, Jr., Mayor of the District of Columbia, Appellant.
 No. 96-7066.
 United States Court of Appeals,District of Columbia Circuit.
 Argued Nov. 8, 1996.
Decided March 4, 1997.
Rehearing Denied June 12, 1997.*
 
 Donna M. Murasky, Assistant Corporation Counsel, Washington, DC, argued the cause for appellant. With her on the brief were Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, Washington, DC. Edward E. Schwab, Assistant Corporation Counsel, Washington, DC, entered an appearance.
 Katherine D. McManus, Washington, DC, argued the cause for appellees. With her on [323 U.S.App.D.C. 220] the brief were Peder A. Garske and Martin F. Cunniff, Washington, DC. Mark D. Wegener, Washington, DC, entered an appearance.
 Before: WALD, GINSBURG and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TATEL.
 Opinion dissenting in part filed by Circuit Judge WALD.
 TATEL, Circuit Judge:
 
 
 1
 The central question in this case is whether District of Columbia law creates a constitutionally protected entitlement to emergency family shelter. Although D.C. law establishes objective eligibility criteria for homeless families seeking shelter, for a combination of reasons we hold that homeless families lack an expectation of shelter sufficient to create a property right: the city does not provide enough shelter to meet the needs of all eligible families, it leaves allocation of limited shelter space among eligible families to the unfettered discretion of city administrators, and nothing in District law prohibits administrators from allocating space in such a way that not all eligible families receive shelter. Indeed, the city administered the family shelter program just that way at the time this suit was filed. We thus reverse the district court's due process ruling. We agree with the district court, however, that the city's policy allowing certain advocates for the homeless to visit the Shelter Office waiting room only on Wednesday mornings and Tuesday and Friday afternoons violates the First Amendment.
 
 
 2
 * In 1984, District of Columbia voters approved an initiative known as the District of Columbia Right to Overnight Shelter Act, guaranteeing to "all persons in the District ... the right to adequate overnight shelter." D.C.CODE ANN. § 3-601 (1988 Repl.). Three years later, the City Council enacted the Emergency Shelter Services for Families Reform Amendment Act, authorizing creation of a temporary shelter program for eligible homeless families. Id. § 3-206.3 (1988 Repl.) Known as the Family Shelter Act, it required the Mayor to "claim federal financial participation to the extent allowable by law for housing assistance and services to homeless families with minor children." Id. § 3-206.3(a).
 
 
 3
 After several lawsuits against the city for failing properly to administer its emergency shelter programs produced huge contempt fines, see Atchison v. District of Columbia, 585 A.2d 150, 151 (D.C.1991), the City Council, citing an "explosion" in costs associated with shelter programs, moved to "limit specifically and define clearly the obligation of the District of Columbia" under the Overnight Shelter and Family Shelter Acts. Council of the District of Columbia, Comm. Report on Bill 8-156, at 2, 14 (May 10, 1990). To accomplish this goal, the City Council amended both Acts to provide that nothing in either "shall be construed to create an entitlement in any homeless person or family to overnight shelter." District of Columbia Emergency Overnight Shelter Amendment Act of 1990, D.C. Law 8-197, 37 DCR 4815 (1990) (codified as D.C.CODE ANN. § 3-206.9(a) (1994 Repl.); D.C.CODE ANN. § 3-609 (1994 Repl.)).
 
 
 4
 Under the District's family shelter program, families are eligible for shelter if they are homeless; if they can pay for shelter or, if not, if they receive vocational training or perform community service in exchange for shelter; and if they have not occupied emergency family shelter within the previous twelve months. D.C.CODE ANN. § 3-601 (1994 Repl.). Section 3-605 of the Overnight Shelter Act and District of Columbia Department of Human Services implementing regulations establish additional eligibility criteria for families seeking shelter, including that applicants must be current on city taxes, must not have been evicted or expelled from temporary family housing or emergency shelter for drug-related reasons, and must not have been evicted from public housing for failing to accept employment or training or for nonpayment of rent. Id. § 3-605(b); D.C. Mun. Regs. tit. 29, § 2502 (1992). Shelter applicants must "provide any information [323 U.S.App.D.C. 221] requested by the intake worker that is necessary to establish" their eligibility for emergency shelter, unless the information is not "reasonably available." D.C. Mun. Regs. tit. 29, § 2503. Requested information may include eviction or foreclosure notices, income statements, social security numbers for each family member seeking shelter, and a statement of the reasons the family needs shelter, itself encompassing eighteen subcategories of information. Id.
 
 
 5
 Until May 1995, the city operated its emergency family shelter program through DHS's Office of Emergency Shelter and Support Services. Although the District has since transferred the family shelter program to the Community Partnership for the Prevention of Homelessness, DHS retains authority over the program. Throughout this opinion, we refer to the office administering the shelter program as the "Shelter Office."
 
 
 6
 Because the city lacks space to accommodate all families seeking shelter, and because neither the Overnight Shelter Act nor its implementing regulations direct the Shelter Office how to allocate available shelter, the Office has developed its own system for allocating shelter space among eligible families. Under current procedures, when a homeless family first applies for shelter, the Shelter Office screens the family to determine preliminarily whether the family meets the three basic statutory eligibility requirements. If no eligibility problems appear, the family is placed on a waiting list, assigned a number, and given a "document checklist" identifying the documents needed to verify eligibility. The family is instructed to call the Shelter Office each day to learn whether its number has been reached. Wait-list numbers are usually reached one to two months after families file their initial applications for "emergency" shelter. During this waiting period, about half of the applicant families drop out of the process. When a family's wait-list number is reached, the Shelter Office reviews any additional documentation supplied by the family and makes a final eligibility determination. Families declared eligible then receive shelter.
 
 
 7
 Homeless families ruled ineligible for emergency shelter may obtain administrative review within the Shelter Office, D.C. Mun. Regs. tit. 29, § 2512.1, or a hearing before the District's Office of Fair Hearings. D.C.CODE ANN.s 3-606(a), (c) (1994 Repl.); D.C. Mun. Regs. tit. 29, § 2511.5. Almost all families appealing adverse eligibility determinations are represented by counsel, and the great majority of cases appealed to the Office of Fair Hearings are resolved informally and quickly. Trial Tr. Vol. IV (May 25, 1995) at 564-65. Unsuccessful applicants may appeal to the District of Columbia Court of Appeals. D.C. Mun. Regs. tit. 29, § 2513.1.
 
 
 8
 The Washington Legal Clinic for the Homeless, a nonprofit organization providing services to the District's homeless population, assists families in the shelter application process. Joined by staff members, a privately run shelter, and several homeless mothers, the Clinic filed this suit in 1993, alleging that the city was violating federal and D.C. law and the Fifth Amendment's due process and equal protection guarantees by imposing upon applicants unnecessary and burdensome documentation requirements and by failing to afford disappointed applicants timely hearings.
 
 
 9
 Relying on the First Amendment, the complaint also challenged District policy limiting Clinic staff access to the Shelter Office waiting room. Although the policy allows advocates having pre-existing relationships with shelter applicants to be in the waiting room whenever open, the policy limits advocates without clients, i.e., "unsolicited advocates," to one at a time and only on Wednesday mornings and Tuesday and Friday afternoons. Letter from Jesse P. Goode, Senior Attorney, District of Columbia Department of Human Services, to Katherine D. McManus, Howrey & Simon 1-2 (Mar. 18, 1993).
 
 
 10
 Shortly after the suit was filed, the district court scheduled a hearing on plaintiffs' request for a preliminary injunction to halt alleged violations of a federal emergency assistance program in which the District participated. See Compl. at 43-44. On the eve of the hearing, the city withdrew from the program. When the district court then denied preliminary injunctive relief as moot, Washington Legal Clinic for the Homeless, Inc. v. Kelly, Civ. No. 93-0691, slip op. at 9 (D.D.C. [323 U.S.App.D.C. 222] July 30, 1993), plaintiffs amended their complaint, adding a request for a declaratory judgment that by opting out of federal assistance for the family shelter program, the District had violated D.C.CODE ANN. § 3-206.3(a), which requires the Mayor to seek federal financial assistance for housing and supplemental services to homeless families. See supra p. 3.
 
 
 11
 Over the next three years, the district court rendered the decisions at issue in this appeal. First, declaring the Shelter Office waiting room a nonpublic forum and finding that the city had offered no reasonable grounds for restricting access to the waiting room to only three periods per week, the court ruled that this portion of the District's access policy violated the First Amendment. Washington Legal Clinic for the Homeless, Inc. v. Barry, Civ. No. 93-0691, slip op. at 20, 23 (D.D.C. Mar. 27, 1995) ("WLCH I"). However, concluding that the District "reasonably determined that it cannot accommodate innumerable additional individuals in [the Shelter Office waiting room]," the court sustained the limit to one unsolicited advocate at a time. Id. at 22.
 
 
 12
 Next, the district court ruled that by opting out of federal funding for the city's emergency shelter services, the Mayor had violated D.C.CODE ANN. § 3-206.3(a). Washington Legal Clinic for the Homeless, Inc. v. Barry, Civ. No. 93-0691 (D.D.C. Apr. 12, 1995) ("WLCH II"). The court reached this result even though, again acting through emergency legislation, the District amended section 3-206.3(a) and related code provisions to make the city's participation in federal emergency assistance programs discretionary, rather than mandatory. Id. at 1-2. "The fact remains," the district court concluded, "that from July 1, 1993 [when the city opted out of the federal program] until April 11, 1995 [when the city changed the statute], defendant was in violation of § 3-206.3(a) of the District of Columbia Code." Id. at 2.
 
 
 13
 Third, the district court ruled that plaintiffs had a constitutionally protected right to emergency shelter. WLCH I at 16-17. Following a bench trial, the court held that two aspects of the District's documentation requirements--the city's failure to define "reasonably available" documentation and to coordinate with other DHS offices to assemble documentation--violated plaintiffs' due process rights. Washington Legal Clinic for the Homeless, Inc. v. Barry, 918 F.Supp. 440, 457 (D.D.C.1996) ("WLCH III"). The court also ordered the city to develop swifter appeal procedures. Id. at 459. Finally, finding no discrimination in the wait-list system for allocating emergency shelter, the court entered judgment for the District on plaintiffs' equal protection claim. Id. at 461.
 
 
 14
 Only the city, challenging the district court's due process and First Amendment rulings, has appealed. Because the district court's rulings are either conclusions reached on summary judgment or conclusions of law following trial, our review is de novo. SEC v. Life Partners, Inc., 87 F.3d 536, 541 (D.C.Cir.1996) (questions of law reviewed de novo ); Tao v. Freeh, 27 F.3d 635, 638 (D.C.Cir.1994) (de novo review on summary judgment).
 
 II
 
 15
 Before addressing the district court's due process ruling, we emphasize what is at stake in this case and what is not. The quantity of emergency shelter available to homeless families is not at issue. The District does not attempt to supply shelter to all eligible families, nor does the Clinic seek the creation of additional shelter space. Because the city's emergency family shelters operate at capacity, a fact counsel for the District confirmed at oral argument, this case is not about available beds going empty while homeless families pursue Kafkaesque application procedures. Nor is this case about discrimination in the shelter allocation process; the district court found that the city's current procedures satisfy the Fifth Amendment's equal protection guarantee, a decision the Clinic does not appeal. The sole question before us is whether D.C. laws and regulations governing the city's emergency family shelter program create a constitutionally protected property interest in shelter, which in turn would require that the District's allocation and appeal procedures satisfy due process standards.
 
 
 16
 [323 U.S.App.D.C. 223] We begin with familiar principles. The Fifth Amendment's Due Process Clause prohibits the District of Columbia from depriving persons of "property, without due process of law." U.S. CONST. amend. V. Individuals are entitled to due process, however, only if they have a constitutionally protected property interest. Brock v. Roadway Express, Inc., 481 U.S. 252, 260, 107 S.Ct. 1740, 1746-47, 95 L.Ed.2d 239 (1987); Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). To have a property interest in a government benefit, "a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Roth, 408 U.S. at 577, 92 S.Ct. at 2709. Entitlements derive from "an independent source such as state law," i.e., statutes or regulations "that secure certain benefits and that support claims of entitlement to those benefits." Id.
 
 
 17
 To determine whether a particular statute creates a constitutionally protected property interest, we ask whether the statute or implementing regulations place "substantive limitations on official discretion." Olim v. Wakinekona, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); Tarpeh-Doe v. United States, 904 F.2d 719, 722 (D.C.Cir.1990). Statutes or regulations limit official discretion if they contain " 'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989) (quoting Hewitt v. Helms, 459 U.S. 460, 471-72, 103 S.Ct. 864, 871-72, 74 L.Ed.2d 675 (1983)). In Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017-18, 25 L.Ed.2d 287 (1970), for example, the Supreme Court held that because persons meeting state AFDC eligibility standards automatically qualified for benefits, eligible individuals had a protected property interest in the receipt of the benefits. Where, however, the legislature leaves final determination of which eligible individuals receive benefits to the "unfettered discretion" of administrators, no constitutionally protected property interest exists. Roth, 408 U.S. at 567, 92 S.Ct. at 2704; see Eidson v. Pierce, 745 F.2d 453, 462 (7th Cir.1984) (where landlord participating in federal housing subsidy program has discretion to judge whether an eligible applicant is "otherwise acceptable," no property interest in housing subsidy).
 
 
 18
 Applying these principles, we ask whether homeless families meeting the statutory qualifications for shelter are entitled to receive it. If so, as in Goldberg, eligible families would have a constitutionally protected property interest in shelter. 397 U.S. at 262, 90 S.Ct. at 1017-18. But if not entitled to shelter because administrators have discretion to choose among otherwise eligible families, they would have no constitutionally protected interest. See Eidson, 745 F.2d at 464.
 
 
 19
 As the Clinic observes, the eligibility standards set forth in the Overnight Shelter Act and its regulations are "fact based, objective criteria .... [which] do not involve intangible assessments or discretionary factors." Appellees' Br. at 20. If all families meeting these criteria received shelter, we would agree with the district court and our dissenting colleague that applicants have a constitutionally protected entitlement to shelter. But that is not this case.
 
 
 20
 All parties agree and the City Council has recognized that the District has insufficient resources to provide shelter for all eligible families. Indeed, the supply of emergency shelter has dropped precipitously, from 495 spaces in late 1994 to only 139 in May 1995. WLCH III, 918 F.Supp. at 447. Moreover, neither District statutes nor implementing regulations set forth standards or procedures for allocating scarce shelter space among eligible families. The city has left that matter to the discretion of the Shelter Office. When appellants filed this lawsuit, for example, the Shelter Office used a first-come, first-served system for allocating emergency shelter. Homeless families camped out overnight outside the Shelter Office attempting, often fruitlessly, to secure priority in the application process. WLCH III, 918 F.Supp. at 446. Families found eligible for shelter on one day but turned away for lack of space [323 U.S.App.D.C. 224] returned to square one the next morning, competing for priority with other rejected families as well as with families entirely new to the process. Id. Under this system, not all eligible families received shelter. As in Thompson, although the "substantive predicates" conferring eligibility might be present, a "particular outcome" might not follow. 490 U.S. at 463, 109 S.Ct. at 1910.
 
 
 21
 In early 1994, the Shelter Office abandoned the first-come, first-served system, replacing it with the wait-list procedures currently in effect. Now, all eligible families remaining on the waiting list eventually receive shelter. If this procedure were mandated by statute or regulation, eligible homeless families might well have a constitutionally protected entitlement to shelter, even though delay between application and shelter would almost always occur.
 
 
 22
 But D.C. law does not mandate the wait-list system. Like the pre-1994, first-come, first-served system, the wait-list procedures are informal office policy, WLCH III, 918 F.Supp. at 445 & n. 13, and nothing in governing statutes or regulations prohibits the Shelter Office from again changing its allocation procedures. The Shelter Office could return to the first-come, first-served daily system; it could give priority to families with infants or disabled children; or it could select applicant families at random from a rolling eligibility list. See Appellant's Reply Br. at 13-14. Under the first and third options, some eligible families--those whose names were not called--would never receive shelter, at least as long as shelter supplies remain limited. Under the second option, families having neither infant nor disabled children might or might not receive shelter. As these examples illustrate, the Shelter Office is free to adopt an allocation system under which not all eligible families receive emergency shelter. Indeed, the District candidly acknowledges its "indifferen[ce] to which families, among those eligible for shelter, actually receive it." Appellant's Br. at 35. Under these circumstances, we hold that eligible homeless families lack the "legitimate claim of entitlement" necessary to create a constitutionally protected property right. Roth, 408 U.S. at 577, 92 S.Ct. at 2709.
 
 
 23
 Relying on traditional property law and citing for illustration contingent remainders, vested remainders subject to defeasance, and executory interests, the dissent argues that a property right can exist even though eligible families might not receive shelter. Dissent op. at 227-28. In the realm of real property law, it is certainly true that improbability of vesting will not defeat a contingent future interest in property. See id. at 227-28 nn.2-4. The question in this case, however, is not whether eligible families have a legally enforceable future interest in emergency shelter, but whether they have a constitutionally enforceable property right to emergency shelter. The common law of real property, where uncertainty of future vesting merely reduces the value of property, does not answer that question. Instead, we must look to principles of due process, where the uncertainty of shelter due to the exercise of administrative discretion prevents the creation of a constitutionally protected entitlement. The Supreme Court recognized a constitutionally protected property right in Goldberg because administrators had no discretion in the allocation of AFDC benefits--all statutorily eligible individuals automatically received benefits. 397 U.S. at 262, 90 S.Ct. at 1017. By comparison, relying on Olim, 461 U.S. at 249, 103 S.Ct. at 1747-48, we held in Tarpeh-Doe that the regulations at issue there "fail[ed] to restrict sufficiently the decisionmaker's discretion to generate a protected [liberty or property] interest implicating the due process clause." 904 F.2d at 723.
 
 
 24
 Pointing to procedures available to eligible families denied shelter, the dissent argues that the Shelter Office has insufficient discretion to defeat a constitutionally protected property right. Dissent op. at 228-29. Acting on behalf of its clients, the Clinic regularly uses those procedures, often successfully, to challenge administrative determinations of ineligibility. See supra, dissenting op. at p. 228. Such procedures, however, do not restrict the discretion the City Council has left to administrators to select the method of allocating scarce shelter space among eligible families, and it is the presence of that discretion which precludes a finding of an entitlement [323 U.S.App.D.C. 225] to emergency shelter. That eligible families reaching the top of the wait-list now receive shelter is of no constitutional significance because the Shelter Office can change its procedures tomorrow. See White v. Office of Personnel Management, 787 F.2d 660, 666 (D.C.Cir.1986) (disappointed applicant for administrative law judge position had no property interest in spot at top of selection register; government could change its procedures without prior notice and hearing). The dissent views this as an "extreme notion," Dissent at 232, but the notion is not ours. The District has chosen to leave just this kind of discretion in the hands of its administrators.
 
 
 25
 We agree with the dissent that in certain circumstances property rights may arise from administrative "rules or understandings." Roth, 408 U.S. at 577, 92 S.Ct. at 2709; Perry v. Sindermann, 408 U.S. 593, 599-601, 92 S.Ct. 2694, 2698-2700, 33 L.Ed.2d 570 (1972); see Dissent at 230-32. Equally clearly, however, administrative actions may not create property rights where that result would "contravene the intent of the legislature." Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983). Here, the City Council's intent is plain: "Nothing in this chapter shall be construed to create an entitlement in any homeless person or family to emergency shelter...." D.C.Code § 3-206.9(a); see also id. § 3-609 (same). While we doubt that blanket "no-entitlement" disclaimers can by themselves strip entitlements from individuals in the face of statutes or regulations unequivocally conferring them, the District's "no-entitlement" disclaimer reinforces our conclusion that District of Columbia law, by leaving allocation of limited shelter among eligible families to administrative discretion, creates no constitutionally protected entitlement to emergency shelter. Moreover, outside the employment context, we have found no decision of the Supreme Court or of this Circuit holding that administrative rules or understandings existing wholly apart from legislation or regulations may create a property interest. We are not surprised by the lack of such decisions. In the absence of special circumstances neither alleged nor present in this case, such as where reliance on administrative action creates contractual responsibilities, obligations enforceable against the public fisc, i.e., entitlements, may arise only from the people acting through their legislators, not from administrative fiat. See Carducci, 714 F.2d at 176-77.
 
 III
 
 26
 We turn next to the district court's ruling invalidating the city's policy allowing unsolicited advocates to visit the Shelter Office waiting room only during certain hours of the week. The Clinic does not challenge the district court's finding that the Shelter Office is a nonpublic forum, nor its ruling sustaining the limit to one unsolicited volunteer at a time.
 
 
 27
 In a non-public forum, restrictions on First Amendment activity " 'need only be reasonable.' " United States v. Kokinda, 497 U.S. 720, 730, 110 S.Ct. 3115, 3121-22, 111 L.Ed.2d 571 (1990) (plurality opinion) (emphasis omitted) (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 808, 105 S.Ct. 3439, 3452, 87 L.Ed.2d 567 (1985)); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46, 103 S.Ct. 948, 955-56, 74 L.Ed.2d 794 (1983). According to the District, limiting unsolicited advocates' access to the Shelter Office waiting room prevents overcrowding there and protects vulnerable families from disruptive solicitation by advocates for the homeless. We think neither rationale supports the policy. Sustained by the district court and unappealed by the Clinic, the policy limiting unsolicited volunteers to one at a time in the waiting room completely guards against overcrowding. And unless applicants for shelter are somehow less vulnerable on Wednesday mornings and Tuesday and Friday afternoons, we fail to see how barring access during the rest of the week enhances client protection. If the Shelter Office is so concerned about overcrowding and client vulnerability, moreover, we do not understand [323 U.S.App.D.C. 226] why it does not enforce the challenged policy; according to the record, the Office currently allows unsolicited advocates in the waiting room whenever the Office is open. Appellant's Br. at 28 n.7. Because the District has offered no tenable reasons for restricting access to the Shelter Office waiting room to only three periods per week, we agree with the district court that the restriction violates the First Amendment.
 
 
 28
 As an alternative justification for its policy, the District argues that because the Supreme Court has sustained total bans on financial solicitation in airports and outside post offices, see International Soc. for Krishna Consciousness, Inc. (ISKCON) v. Lee, 505 U.S. 672, 683-84, 112 S.Ct. 2701, 2708-09, 120 L.Ed.2d 541 (1992); Kokinda, 497 U.S. at 734, 110 S.Ct. at 3123-24, its partial ban on access to the waiting room likewise satisfies constitutional standards. Although we doubt the validity of this argument--it disregards the obvious difference between soliciting money and offering assistance to homeless families--we need not address it. Whether partial or total, limitations on First Amendment activity in a nonpublic forum must be reasonable. Kokinda, 497 U.S. at 730, 110 S.Ct. at 3121-22. The District offers no justification at all for a total ban and, as we have held, its reasons for the partial ban are unconvincing.
 
 IV
 
 29
 In a footnote to the "Conclusion" section of its brief, the District makes one final request: that we vacate the district court's declaratory judgment that the city violated D.C.CODE ANN. § 3-206.3(a), requiring it to "claim federal financial participation to the extent allowable by law for housing assistance and services," from July 1, 1993, until April 11, 1995. Contrary to FED.R.CIV.P. 28(a)(3) and D.C.CIR. R. 28(a)(1)(B), however, the District did not include this argument in its statement of issues under review. Appellant's Br. at 2. Moreover, the District offers only bare-bones arguments to support its request. Id. at 40-41 n. 10. Appellees responded to the District's footnote with a terse footnote of their own on the last page of their brief. Appellees' Br. at 38 n.11. The District's reply brief is silent on the issue. Because the District raises this issue in "such a cursory fashion," we decline to resolve it. Texas Rural Legal Aid, Inc. v. Legal Servs. Corp., 940 F.2d 685, 697 (D.C.Cir.1991) (when appellant "content[s] itself with conclusory assertions" and appellees "d[o] not address the merits of the claim at all," court normally will not address claim); see also Railway Labor Executives' Ass'n v. United States R.R. Retirement Bd., 749 F.2d 856, 859 n. 6 (D.C.Cir.1984) (declining to resolve issue "on the basis of briefing which consisted of only three sentences ... and no discussion of the relevant statutory text, legislative history, or relevant case law").
 
 V
 
 30
 We reverse the district court's ruling that District law creates a property interest in emergency family shelter and remand for further proceedings in accordance with this opinion. We affirm the district court's conclusion that the policy limiting unsolicited advocates' access to the Shelter Office waiting room to certain times of the week violates the First Amendment.
 
 
 31
 So ordered.
 
 WALD, Circuit Judge, dissenting in part:
 
 32
 I part from the majority on the issue of whether families eligible for emergency shelter under the District's laws and regulations have a "property interest" which triggers some form of procedural protection under the Fifth Amendment Due Process Clause. I agree with the district court that families who meet the threshold eligibility requirements of the statute and whose place on the waiting list has been reached are entitled to some modicum of procedural due process by virtue of the statutory mandate of the program, and the Shelter Office's policy and practice in the administration of the program. Thus I respectfully dissent from that [323 U.S.App.D.C. 227] portion of the majority opinion finding no entitlement worthy of procedural protection.
 
 
 33
 In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court defined the parameters of Fifth Amendment "property interests" to incorporate the fundamental tenets of the "ancient institution of property." Id. at 577, 92 S.Ct. at 2709. According to these enduring principles, a person has no "property" interest in a thing simply because he has an "abstract need or desire for it," or a "unilateral expectation of it." Id. Rather, he must have a "legitimate claim of entitlement to it," id. at 577, 92 S.Ct. at 2709; a claim based on some "rule[ ] or understanding[ ]" that "secure[s]" the benefit for the claimant and supports his claim of entitlement. Id. Thus it is common ground that a statute declaring that people meeting certain eligibility criteria will receive a government benefit secures the benefit for those people, just as a blanket of common law rules secures more traditional forms of private property for individuals. Id. (citing Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). And correlatively the fact that only those who meet specified criteria are entitled to the benefit does not mean that due process doesn't enter the picture until eligibility has been conclusively proved, since this approach would deny the very procedures needed to demonstrate that a property interest exists in the first place. See id. ("[T]he welfare recipients in Goldberg v. Kelly ... had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so."); see also Griffeth v. Detrich, 603 F.2d 118 (9th Cir.1979) (applicants for public assistance have a property interest in the benefit).[1]
 
 
 34
 The Roth Court's distinction between "abstract need[s] or desire[s]" or "unilateral expectation[s]," on the one hand, and "legitimate claim[s] of entitlement" on the other, mirrors the old common law distinction between "bare expectancies," which are not recognized as legitimate property, and future interests, which are. See LEWIS M. SIMES & ALLAN F. SMITH, THE LAW OF FUTURE INTERESTS § 391 (2d ed.1956) (distinguishing future interests from "bare expectancies"); 1 AMERICAN LAW OF PROPERTY § 4.1 (A. James Casner ed., 1st ed.1952) (same); see also Gregory S. Alexander, The Concept of Property in Private and Constitutional Law: The Ideology of the Scientific Turn in Legal Analysis, 82 COLUM. L.REV. 1545, 1570-71 (1982). The clearest example of the former is an apparent or presumptive heir who has a "unilateral expectation" of inheriting; this bare expectancy is like a fish that one hopes to catch, or a bird in the bush--it is not property. The concept of property exists to "protect those claims upon which people rely in their daily lives," Roth, 408 U.S. at 577, 92 S.Ct. at 2709, not to enable people to claim "ownership" of whatever they think they deserve. On the other hand traditional property law readily acknowledges that, if there is some formal statement or understanding establishing that a person can expect a benefit in the future provided that specified contingencies are satisfied, that person does have a property interest--specifically, a future interest--in the benefit, even if the specified contingencies may never occur. Although the privilege of possession or enjoyment is deferred for the holder of a future interest, it is "of the essence" that such an interest "is property which now exists." See 1 AMERICAN LAW OF PROPERTY § 4.1, at 405. Examples of such future interests are contingent remainders,[2] vested remainders subject to complete defeasance[323 U.S.App.D.C. 228] ,[3] and most executory interests[4] where the right of actual possession is subject to conditions which may or may not occur. See id. Although the holder of such a future interest may realistically have a smaller probability of ever gaining possession of the benefit than the holder of a "bare expectancy," the former's interest receives higher priority in the eyes of the law because unlike the latter's it is not merely subjective or "unilateral," but the product of a joint agreement with the present owner.
 
 
 35
 Applying these bedrock principles of property law to the facts of this dispute,[5] I find myself in disagreement with the majority's unequivocal statement that "eligible homeless families lack the 'legitimate claim of entitlement' necessary to create a constitutionally protected property right." Majority opinion at 37 (quoting Roth, 408 U.S. at 577, 92 S.Ct. at 2709) (citation omitted). I believe that under the Family Shelter Act as implemented by the Shelter Office, eligible homeless families[6] have precisely the sort of future interest in emergency shelter that our legal traditions have long regarded as a legitimate property interest. The statute and regulations defining the program and specifying the criteria for eligibility secure the benefit for eligible families, even though they include a contingency which is not certain to occur in the case of any individual eligible family--the availability of emergency shelter to meet their need. To pursue the analysis a bit further: If, in a given year, the District were to fund the emergency shelter program fully enough to reach all eligible families, then no one suggests that each eligible family would not receive emergency shelter regardless of the degree of discretion accorded to the Shelter Office over the intake procedure. In short, the administering agency does not have discretion to deny emergency shelter to eligible families. If, as is the case now, the amount of shelter available regularly falls short of the need, many statutorily-eligible families must wait until their interests ripen into rights of present possession, just as holders of other future interests wait for specified contingencies to occur such that they may take possession of more traditional forms of property. As with almost any government largesse or "new property," see Goldberg, 397 U.S. at 262 n. 8, 90 S.Ct. at 1017 n. 8, there is the additional understanding that the government may by legislation eliminate the benefit program entirely in the interim. In Goldberg, however, the Supreme Court implicitly held that this inherent power of government to repeal or modify legislative programs does not preclude a potential government benefit from constituting an entitlement [323 U.S.App.D.C. 229] that triggers due process protections while the program is in effect. See Goldberg, 397 U.S. at 262, 90 S.Ct. at 1017 ("[welfare benefits] are a matter of statutory entitlement for persons qualified to receive them.") (citing Charles A. Reich, The New Property, 73 YALE L.J. 733 (1964)).
 
 
 36
 It is extremely important, then, in any due process entitlement analysis to distinguish between the uncertainty of public shelter stock, which makes the eligible families' interest in the shelter a contingent future interest, and whatever discretion has been delegated to the Shelter Office to decide the priority in which individual eligible families will be assigned available shelter. The majority suggests that the Shelter Office's discretion in determining the intake priority for eligible families is utterly unconstrained, such that intake workers may simply choose their favorite eligible family whenever a unit becomes available. But the majority's premise that the Shelter Office enjoys such "unfettered discretion," majority opinion at 220, is in fact impossible to reconcile with the regulations governing the administration of the shelter program. These regulations set out in detail the eligibility criteria, see D.C. Mun. Regs. tit. 29, § 2502, and specify that these criteria shall constitute the grounds for the denial of shelter. See id. § 2510.1. Other than those denied shelter based on the unavailability of housing resulting from funding limitations, see id. § 2511.2, any applicant family denied shelter is entitled to notice, "both oral[ ] and in writing," of the reasons for the denial--"including reference to the law or regulations supporting the action." Id. § 2511.4. The applicant family may request a "Fair Hearing," and may include in the request information that may be pertinent to the denial. See id. § 2511.7. At the hearing, the applicant family is entitled to present testimony, witnesses or other evidence, to cross-examine the District's witnesses, and to be represented by counsel. See id. § 2511.10. When the hearing examiner issues a decision, she must put it in writing, being careful to include findings of fact "based exclusively on evidence presented at the hearing," and conclusions of law supported by appropriate citations. Id. § 2511.11. Families that fail to secure a favorable result from the Fair Hearing may appeal the final adverse decision to the District of Columbia Court of Appeals. See id. § 2513.1.[7] If, as the majority postulates, an eligible family that reached the top of the waitlist could be passed over for the next available unit pursuant to the Shelter Office's inscrutable whim or "unfettered discretion," this extensive set of procedures would be the cruellest of shams. If the Shelter Office had no "law or regulations" to cite in support of its decision to deny them shelter, what earthly purpose would the "Fair Hearing" procedures and review by the District of Columbia Court of Appeals serve? In short, it is beyond my ken that the District painstakingly drafted the blueprints for such an intricate [323 U.S.App.D.C. 230] structure of procedural protections built atop the quicksand of "unfettered discretion."[8]
 
 
 37
 Even if the Shelter Office does have some degree of discretion to determine what system of intake priorities it will use, that sort of administrative discretion is fundamentally and qualitatively different from "unfettered discretion" to determine whether eligible families will receive shelter regardless of its availability. I do not read the statute and regulations to accord the Shelter Office any, let alone "unfettered," discretion of the latter type. Other courts have identified this distinction as relevant in determining the existence of entitlements to due process procedures. In Eidson v. Pierce, 745 F.2d 453 (7th Cir.1984), the Seventh Circuit ruled that holders of federal housing subsidies had no property interest in particular private housing units because the owners of those units had complete discretion to turn away individual subsidy-holders for any reason or for no reason at all, even when the subsidy-holders had stellar credit and references and an apartment stood empty. See Eidson, 745 F.2d at 461. The Shelter Office, in our case, has no such absolute power to turn away eligible applicants. While the Office presumably could change (and has in fact changed) from a first-come-first-served to a waitlist system, and perhaps could change again to give priority to different specific characteristics of needy families, the fact remains that if at any point in time there is an available unit for an eligible family, the Shelter Office is without authority to turn that family away. See D.C. Mun. Regs. tit. 29, § 2503 (1992) ("At the time of initial application for ... temporary family housing services ... the Department shall inform the applicant that he or she is required to provide documentation of eligibility ... The Department shall verify that an applicant is homeless ... The Department shall provide an applicant family determined eligible for temporary family housing a written referral to a designated temporary family housing facility.").
 
 
 38
 Indeed, Eidson specifically noted the quintessential difference between programs that distribute scarce benefits according to unfettered discretion and programs whereunder such benefits are distributed according to preset eligibility criteria. Referring to their earlier decision in Davis v. Ball Memorial Hospital Ass'n, 640 F.2d 30 (7th Cir.1980), the Eidson court distinguished the indigent hospital care program at issue in Davis by observing that "[i]f the patient established facts showing his or her eligibility, and if the hospital had not yet met its financial obligations for the year, then the patient was entitled to the benefits" under the hospital's first-come-first-served intake system. Eidson, 745 F.2d at 462 (emphasis added). Thus "a hearing in Davis could establish entitlement," while a hearing for subsidy-holders turned away by private landlords could not. See id. Similarly in our case, if shelter is available and under the existing allocation system no other eligible applicant family has a higher priority, some form of due process procedure would have the practical consequence of ensuring that an eligible applicant family would receive the shelter.
 
 
 39
 The unfortunate reality that the number of eligible families currently exceeds the number of available shelter units does indeed prevent many eligible families from receiving shelter, but by itself the improbability that a future interest in property will ever vest has never turned cognizable property interests into noncognizable "bare expectations." For example, the holder of a future interest which trails behind a series of prior life interests may, as a practical matter, have scant chance of ever coming into possession of the property, but he nonetheless holds a legally recognizable interest in the property. Similarly, individual eligible families may have little chance of receiving shelter, but this is essentially a function of the project's limited funding. One need only conjure up a situation in which available shelter units outnumber eligible applicants to realize that the Shelter Office's discretionary allocative power is not of the sort that removes the applicants' [323 U.S.App.D.C. 231] claims from the realm of property interests. See supra notes 40-41 and accompanying text; see also Eidson, 745 F.2d at 462; cf. Ressler v. Pierce, 692 F.2d 1212 (9th Cir.1982) (persons within the "class of individuals" intended to benefit from a rent subsidy program have a property interest in the subsidy); Vandermark v. Housing Auth. of York, 663 F.2d 436 (3rd Cir.1981) (applicants for housing subsidy "certificates" have a property interest in the certificates); Baker v. Cincinnati Metro. Hous. Auth., 675 F.2d 836 (6th Cir.1982) (same).
 
 
 40
 Accordingly, because the interests of eligible families fall squarely within the realm of interests traditionally recognized under the common law of property, families have a right to some due process protection in the intake procedure which determines their eligibility; that right is "triggered" by the nature of the District's shelter program itself, and by the regulations implementing the program.
 
 
 41
 Furthermore, the Supreme Court recognized in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), overruled on other grounds by Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), that traditional notions of property do not, by excluding "mere subjective 'expectanc[ies]'," id., 408 U.S. at 603, 92 S.Ct. at 2700, preclude individuals from claiming a property interest in a benefit based on the "policies and practices" of the institution controlling the distribution of the benefit. Id.; see also Tarpeh-Doe v. United States, 904 F.2d 719, 724 (1990); Sherrill v. Knight, 569 F.2d 124, 131 n. 22 (D.C.Cir.1977). Institutional "policies and practices" that may create procedural entitlements need not be enshrined in any statute, rule, or regulation; in fact they need not even be written down. See Perry, 408 U.S. at 602, 92 S.Ct. at 2700 ("[T]here may be an unwritten 'common law' in a particular university that certain employees shall have the equivalent of tenure."). But in fact, the Waiting List policy is "written down"; it is incorporated into a form that the Shelter Office distributes to all applicant families who have passed a preliminary eligibility determination, that tells them where they are on the waiting list. See Exhibits Volume 1 at 3065 (form bearing the heading "FAMILY SHELTER WAITING LIST IDENTIFICATION FORM," with a space for the applicant family's "Waiting List number"). What a travesty it would be if the Shelter Office could distribute such Waiting List placements and then blatantly ignore them in handing out shelter to the most impoverished segment of our community. No one has suggested that such a practice would comply with the statute and regulations governing the administration of the shelter program.
 
 
 42
 Nor can I agree that the Shelter Office's current Waitlist Policy is incapable of giving rise to an entitlement because "the Shelter Office can change its procedures tomorrow." Majority opinion at 225. The same of course could have been said of the alleged "common law" tenure system at issue in Perry, which the Court thought might well be entrenched enough to create reasonable expectations deserving of due process protection.[9] Institutional policies or patterns of official action may spawn entitlements while they are in effect; it is their pervasive penetration into the day-to-day practice of an institution and the expectations these practices raise in affected constituencies which is determinative.[10]
 
 
 43
 [323 U.S.App.D.C. 232] When an alleged property interest is based in an institution's policy or practice, rather than in a statute or regulation, a claim of entitlement may sometimes depend on the individual's own status with regard to the relevant policy or practice. For example, the teacher claiming an entitlement to tenure in Perry premised his claim both on the "common law" tenure system that he alleged had been followed by the university and on the fact that he had been teaching in the institution long enough for his tenure interest to have "vested" under that unwritten system. See Perry, 408 U.S. at 602, 92 S.Ct. at 2700 ("A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service--and from other relevant facts--that he has a legitimate claim of entitlement to job tenure.") (emphasis added). Similarly, it might be argued that any entitlement created by the waitlist policy currently in effect does not "vest" until a family has reached a certain status vis-a-vis the waitlist such that specific shelter is available to them if they meet eligibility requirements. But even if that were true, eligible families would minimally have a property interest of the Perry variety which "vests" at the point that they reach the top of the waitlist and a unit becomes available for their occupancy. Because the Shelter Office's current policy and practice is to conduct a final eligibility determination for a family only when a unit becomes available and that family is at the top of the waitlist, seemajority opinion at 222, families that have ascended to that pinnacle and can demonstrate their eligibility clearly have a "legitimate claim of entitlement" to the available unit. See Perry, 408 U.S. at 602, 92 S.Ct. at 2700. Indeed the existence of an appeal procedure to control denials of shelter following such determinations attests to the District's acknowledgment that such families have a reasonable expectation of shelter. See D.C. Mun. Regs. tit. 29, § 2511.1 (1992) ("Any applicant ... who is aggrieved by the Department's decision to deny ... temporary family housing ... has a right to a fair hearing from the Department's Office of Fair Hearings, except [if the denial is based on the unavailability of shelter resulting from funding limitations].").[11]
 
 
 44
 Finally, it is useful to reiterate that the "entitlement" we are debating here is a far cry from any right to emergency shelter "on demand"; it is nothing more than an interest in shelter which I find sufficiently substantial to implicate the constitutional requirement of regularized procedures in the allocation of what shelter is available to eligible families. The majority seems peculiarly taken with what I regard as an extreme notion--that the statute and implementing regulations [323 U.S.App.D.C. 233] permit the Shelter Office on a whim or caprice to disclaim all statements it has made to applicant families regarding their priority for receiving shelter pursuant to an intake system that has been in place for months, and perhaps even years, and either announce with no notice or formal procedure a new "allocation scheme for the day" or just choose their favorite families to receive the available shelter units. Nothing I can find in the relevant legislation, regulations, or public statements put out by the Shelter Office suggests the existence of any such "unfettered discretion." In fact, the regulations mandate the opposite conclusion, explicitly requiring the Shelter Office to deny shelter only to those found ineligible under the law or those for whom no shelter is available.
 
 
 45
 Because I believe that families at the head of the waiting list who are found eligible for emergency shelter have a constitutionally-protected property interest in available shelter which is deserving of procedural due process protection, I would proceed to the issue of whether the District's present intake procedures satisfy these strictures.[12] On this due process issue, I respectfully dissent from the majority opinion.
 
 
 
 *
 Circuit Judge Wald would grant the petition
 
 
 [1]
 After articulating these principles, the Court applied them to deny a professor at a state university any "property" interest in continued employment at the university, because the terms of his appointment specifically provided that his employment would terminate on a fixed date, and made no mention of renewal. Roth, 408 U.S. at 578, 92 S.Ct. at 2709-10
 
 
 [2]
 Contingent remainders are remainders (future interests in someone other than the transferor or his successor in interest that take effect at the termination of a prior estate) that are subject to some condition precedent other than the termination of all prior estates. See AMERICAN LAW OF PROPERTY §§ 4.25, 4.36. Thus if A conveys property "to B for life, and if C survives B and lives to attain the age of twenty-one, then to C and his heirs," C has a contingent remainder. See id. at § 4.36
 
 
 [3]
 Vested remainders subject to complete defeasance are remainders that are vested (i.e., that become a present estate whenever and however the preceding estates terminate) and that are subject to termination on conditions that may occur before, at, or after the termination of the prior estates. See id. § 4.35. If O conveys property "to A for life, remainder to B and his heirs, but if B die without leaving any children him surviving, then to C and his heirs," B has a vested remainder subject to complete defeasance. See id
 
 
 [4]
 Executory interests are future interests in a transferee that cut off another's vested interest immediately upon the occurrence of a specified condition or event. See id. § 4.53. If A conveys property "to B and his heirs, but if B die without leaving children him surviving, then to C and his heirs," C has an executory interest. See id. § 4.55
 
 
 [5]
 The majority makes the unsupported assertion that these principles, however forceful they may be "[i]n the realm of real property law," have no place in the inquiry into whether a "property interest" protected by the Constitution exits. Majority opinion at 224. But the Constitution extends due process protection to deprivations of "property," an institution which is, and always has been, defined and given substance by real property law. The Supreme Court recognized this in Roth, explicitly incorporating "the ancient institution of property" into its discussion of the parameters of protected "property" interests. Roth, 408 U.S. at 577, 92 S.Ct. at 2709
 
 
 [6]
 To be eligible under the applicable statutory and regulatory provisions, families must be homeless, must be willing to pay for shelter if able or to accept vocational training or perform community services in exchange for shelter if unable, must not have occupied emergency family shelter within the previous twelve months, must be current on city taxes, must not have been evicted or expelled from temporary family housing or emergency shelter for drug-related reasons, and must not have been evicted from public housing for failing to accept employment or training without good cause, or for nonpayment of rent. See majority opinion at 220-21
 
 
 [7]
 The procedures articulated by these regulations are fundamentally unlike those that this court found insufficiently constraining to create a protected interest in Tarpeh-Doe v. United States, 904 F.2d 719 (D.C.Cir.1990). Cf. majority opinion at 224. In Tarpeh-Doe we reviewed the denial of a claim brought under the Federal Tort Claims Act, which authorized but did not require the heads of federal agencies to adjudicate the relevant claims. See id. at 721-22. The agency had in fact issued regulations providing for the adjudication of such claims, but had incorporated neither substantive criteria nor a requirement of any explanation or statement of reasons for denials--a fact which this court singled out as "[s]ignificant[ ]." Id. at 722. In this case, the regulations require a written decision based on evidence and conclusions of law supported by citations, and specify only the eligibility criteria listed in the statute and regulations as reasons for denial. In rejecting the claim to a protected interest made in Tarpeh-Doe, this court moreover explicitly noted that no evidence regarding the agency's "past practice" in dealing with such claims had been presented, and strongly suggested that such evidence might have required a contrary holding. Id. at 724 ("It bears emphasis that we hold only that the language of the statutes and regulations at issue does not, without more, support the district court's ruling [that a protected interest existed].... It is possible, of course, for a legitimate expectation to arise based upon the consistent practice of a decisional body--even in the absence of express regulatory language or in the face of ostensibly contradictory agency policy statements.") (emphasis in original) (citing Perry, 408 U.S. at 601-03, 92 S.Ct. at 2699-2700). There is, of course, extensive record evidence in this case regarding the Shelter Office's recent "consistent practice" of distributing shelter according to a "waiting list" system
 
 
 [8]
 Thus I obviously disagree with the majority's assertion that the intake procedures which the Shelter Office institutes exist "wholly apart" from any law or regulation. Majority opinion at 225. Far from being "wholly apart" from the regulations, the implementation of an intake procedure constraining "unfettered discretion" is the linchpin without which these regulations would be rendered completely ineffectual
 
 
 [9]
 The Court affirmed the appeals court's remand, to give the respondent "an opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.' " Perry, 408 U.S. at 603, 92 S.Ct. at 2700 (citation omitted)
 
 
 [10]
 Although the factual scenario in White v. Office of Personnel Management, 787 F.2d 660 (D.C.Cir.1986), was somewhat similar to this case, I do not think the White decision's cursory rejection of a due process claim which the plaintiff raised only in his reply brief bars us from finding a property interest in this case. Cf. majority opinion at 225 (citing White). In White, the plaintiff's last-ditch argument apparently was based on his allegation that the elimination of a selection register on which his name had been entered deprived him of his property interest in his place on the selection register. See White, 787 F.2d at 665 ("In his reply brief and at oral argument, White changed his strategy somewhat and asserted that he had been deprived of a protected property interest. He argues that his spot on the selection register constituted such an interest.") (emphasis added). Here eligible homeless families are not asserting a property interest in their places on the waiting list, but rather a defeasible interest in the shelter itself. As I pointed out earlier, this interest is capable of vesting as long as the allocation system remains in place. No one suggests the agency cannot change that system through regularized procedures, just as OPM did in the White case. But no such system change has taken place here, and the mere possibility that it could does not divest the applicant family at the top of the list of its property interest
 
 
 [11]
 I do agree with the majority that the statute's disclaimer, "[n]othing in this chapter shall be construed to create an entitlement in any homeless person or family to emergency shelter...." D.C. CODE ANN. § 3-609, does not by itself control the due process determination. See majority opinion at 225. To the extent that this provision could be read as the City Council's attempt to require this court to construe the Fifth Amendment in a particular way, it is of course without effect. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Rather, the disclaimer is more naturally read as the District's answer to an applicant family's argument that the failure to provide enough shelter to reach all eligible families violates the terms of the statute. This is the construction that the District itself has placed upon this provision, by implementing it in the form of a regulation stating that "[e]ligibility for temporary housing ... does not entitle a homeless person to shelter...." D.C. Mun. Regs. tit. 29, § 2500.3 (1992). (Because I concede that the statute does not require the District to provide a quantity of shelter sufficient to reach all eligible families, I am certainly not suggesting that eligible families hold an "obligation[ ] enforceable against the public fisc." Majority opinion at 225.) Furthermore, a Perry-type entitlement would not violate the terms of the statutory disclaimer, because such entitlements spring from institutional policies and practices, rather than from the statute alone. The disclaimer only seeks to prevent anything "in th[e] chapter" from being construed as creating an entitlement to shelter
 
 
 [12]
 In brief, I would affirm the district court's holding that the failure to define criteria establishing which documents are to be considered "reasonably available," and the essentially arbitrary nature of the appeals process, violate the requirements of due process. See Washington Legal Clinic for the Homeless v. Barry, 918 F.Supp. 440, 456-59 (D.D.C.1996)